**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200470-U

Order filed March 21, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal No. 3-20-0470 Circuit No. 18 CF 697 |
| JOSE GUADALUPE RAMIREZ, | ) ) | Honorable Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Holdridge and Justice Peterson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: The trial court's imposition of a mandatory life sentence on a 21-year-old defendant was not unconstitutional as applied to him, and the trial court did not err in denying defendant's request to appoint an expert for sentencing proceedings or his request to conduct an evidentiary hearing. Affirmed.

¶ 2    The trial court convicted defendant of two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) for the murders of his adoptive parents and sentenced him to mandatory life imprisonment without parole (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2020)). Defendant raises three arguments on appeal. First, he argues his mandatory life sentence is unconstitutional as applied to

him, alleging the court failed to consider his youth, traumatic and abusive upbringing, mental health issues, and potential for rehabilitation. Second, defendant argues the court erred in refusing to appoint an expert for sentencing proceedings, which precluded him from presenting evidence to support his as-applied constitutional challenges. Third, he argues the court erred in denying his as-applied constitutional challenges without allowing him to develop the record pursuant to *People v. Harris*, 2018 IL 121932. His second and third arguments are made in the alternative to his first argument if we find the record is insufficient to rule on his first argument. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On October 28, 2018, defendant called 911 to report his parents missing and that someone had broken into their house. Police entered the home and saw blood throughout. The television was missing from the living room. Dresser drawers and jewelry boxes were open in the parent's bedroom. Police noted large bloodstains on the floor of the bedroom and all sheets and bedding had been removed from the bed. Defendant later confessed to police that he and his codefendant had snuck into the house, where defendant then maced his parents, hit them over the head with a bat, and stabbed them in the stomach and throat. They wrapped the bodies in a tent and a tarp, loaded them into his father's car, and threw them off a bridge.

¶ 5        Defendant led police to the purported dump site in the Kewanee area, approximately 45 minutes away from the house. Police did not find the bodies there. The bodies were found two days later in the Spoon River, 12 minutes away from the house. The victims were wearing pajamas. The cause of death for both victims was multiple blunt-force and sharp-force injuries. Defendant's father had bruises all over his torso and head area, stab wounds to the torso, slice marks to the throat, skin tears in the head, and his right ear was destroyed. Defendant's mother had a single stab wound under her right armpit, multiple stab wounds or slices on her throat, and skin tears on the

2

top of her head. The coroner's autopsy revealed the time between onset of injuries and death was minutes.

¶ 6    Police recovered the missing television and other items in the crawlspace at defendant's friend's house where defendant had been staying. While being interviewed at the station, defendant told police "the why" was not important. He felt remorse for getting his friend involved, but not for the murders themselves, because he felt that he could not live while his parents were still alive. He was 21½ years old at the time of the murders.

¶ 7    Before trial, Dr. Terry Killian evaluated defendant's fitness to stand trial and his sanity at the time of the offense. He reported the evaluation was thorough, as defendant was facing a possible sentence of life in prison without parole. Defense counsel did not provide the State or trial court with a copy of Dr. Killian's report prior to trial. The report included the following history. Defendant was removed from his biological mother's care when he was three years old due to physical and sexual abuse by the mother's boyfriends. He was abused in foster care. The victims adopted defendant when he was eight years old.  Defendant began seeing a therapist shortly after the adoption and continued to see her until two months before the murders. The therapist diagnosed him with reactive attachment disorder (RAD). Her therapy notes specified a concern for his adoptive mother's safety at home. Defendant attended a residential therapeutic high school out of state, returning to Illinois for his senior year. Dr. Killian noted defendant's childhood was fraught with abuse but concluded that defendant was fit to stand trial and sane at the time of the offense.

¶ 8    The trial court found defendant guilty of two counts of first degree murder after a three-day bench trial. After the trial, defendant filed several posttrial motions: (1) a motion asking the court to appoint a mental health expert for sentencing; (2) a motion to declare the mandatory natural life imprisonment statute (730 ILCS 5/5-8-1 (West 2020)) unconstitutional under the

3

United States and Illinois constitutions as applied to defendant, due to his age and mental health issues; and (3) an amended motion requesting a hearing pursuant to *Harris*, 2018 IL 121932, and asking the court to appoint Dr. Killian to prepare a report and testify at the requested hearing. When these motions were denied, defendant filed a motion for a new trial, averring that the court erred in denying defendant's request for an expert for sentencing purposes.

¶ 9        Defendant sought an expert to evaluate defendant's presentence investigation report (PSI) and history for the purpose of mitigation. The State argued that Dr. Killian had already examined defendant, and although the State was never provided a copy of the report, defense counsel was in possession of the psychiatric evaluation and presumably would call Dr. Killian to testify at sentencing if the report contained mitigating information. Defendant argued Dr. Killian's purpose for initially evaluating defendant was not for mitigation, but for fitness and sanity. He wanted to find a qualified individual to evaluate for mitigation at a more economical rate than Dr. Killian. Defendant later asked the court to appoint Dr. Killian, as Dr. Killian could probably use his report for the purposes of mitigation, and it would likely be quicker and cheaper than hiring a different expert. He asked for funds not to exceed $3000. The State objected because Dr. Killian already wrote a report that the State had not seen.

¶ 10        On January 27, 2020, the trial court issued a written order denying defendant's motion to declare the sentencing statute unconstitutional. The trial court wrote,

> "Both the Unites States Supreme Court and the Illinois Supreme Court have 'unmistakenly instructed that youth matters in sentencing.' *Roper v. Simmons*, 543 U.S. 551, 578-579 (2005); *Graham v. Florida*, 560 U.S. 48, 82 (2010); *Miller v. Alabama*, 567 U.S. 460, 489 (2012); *People v. Holman*, 2017 IL 120655, ¶ 1.

The Supreme Court has never extended its reasoning to young adults age 18 or over. In fact, the Supreme Court has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing is 18.

Further, claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected. *United States v. Williston*, 862 F.3d 1023, 1039-40 (10th Cir. 2017); *U.S. v. Marshall*, 736 F.3d 492, 500 (6th Cir. 2013); *People v. Argeta*, 149 Cal. Rptr. 3d 243, 245-246 (Ct. App. 2012).

In the instant case, the Defendant was 21 ½ at the time of the offense. The Defendant's claim fails both *generally* and *as applied*."

¶ 11 Before sentencing, the court received and reviewed the PSI, Dr. Killian's pretrial forensic psychiatric evaluation, and Dr. Killian's proffered testimony. The State moved to strike Dr. Killian's proffered testimony, arguing that his testimony asked the court to disregard the law. The trial court allowed the testimony, stating it would address the proffered testimony in its sentencing remarks.

¶ 12 At the sentencing hearing, the parties agreed that, because defendant was over 18 years of age and had murdered two people, he was subject to mandatory life imprisonment without parole. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2020). The State offered no evidence in aggravation but presented a victim impact statement. Defendant offered no formal evidence in mitigation but presented letters in his support, which stated defendant was publicly humiliated and emotionally abused by his adoptive mother, and his actions were not typical of him. Defendant stated in allocution,

"I can't excuse the actions that I have done, but I feel like that if I'm given life without the possibility of parole, I'm being denied the chance that I cannot

5

prove to people that I can change, but I also realize that actions always have consequences, whether good or bad, and whatever consequences you give me today, I will completely respect those."

¶ 13    The trial court considered the PSI, trial evidence, victim impact statement, statement in allocution, arguments of counsel, statutory and nonstatutory factors in aggravation and mitigation, defendant's history and character, and seriousness of the offense. In ruling, the trial court found,

"In aggravation, Mr. Ramirez, I sat through the trial and I watched you when you were being interrogated, and I watched you confess to killing your parents with little to absolutely no emotion, with no remorse, with no concern of the terror, the fear, and the betrayal that they must have felt while you pepper sprayed them, beat them, and then stabbed them.

\*\*\*

One of the most disconcerting events—in my involvement in what occurred and then my role in this case has been one of the most disconcerting things I've ever seen. The legislature has set out what happens to people that do things that you did.

Mr. Ramirez, I read every word of those letters from people that knew you before, and I read every word of the terrible things that happened to you before your parents ever got involved, and through those things, I have compassion for you that you as a child had to suffer that and it shouldn't have happened, period.

But you were given an opportunity with your parents that lots of children that endured things like you did would have loved to have had \*\*\* and instead of

6

working it out, you acted out in a manner that was so vicious to the people that altered the course of their entire lives for you.

* * *

There's lots of children that have difficult lives, and there is not one instance where what you did can be put into context or explained.

With respect to the proffered testimony of Terry Kilian, whether I consider that testimony or I don't, it does not change the outcome of what you have done.

You are correct when you indicated that there are consequences for your actions, and the fact that you were approximately 21 and a half years of age does not in any way, shape, or form change the analysis of what should be done pursuant to statute because that age has been considered by many courts along the way."

Accordingly, the court sentenced defendant to life imprisonment without parole.

¶ 14 Defendant moved to reconsider his sentence, arguing it was excessive and unconstitutional as applied to him. The court denied the motion, and this appeal followed.

¶ 15                                    II. ANALYSIS

¶ 16 Defendant's primary contention is that his sentence of mandatory life without parole is unconstitutional as applied to him, and the record is sufficiently developed to allow this court to review his claim. Alternatively, he contends, if the record is not sufficient to review his claim, we should remand the matter for new sentencing proceedings because the trial court erroneously refused to appoint an expert for sentencing and failed to conduct an evidentiary hearing.

¶ 17 Because defendant's alternative argument relies on the premise that the record is insufficient to review his claim, we must first determine whether the record is sufficient.

¶ 18                         A. Completeness of the Record

7

¶ 19        "All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Harris*, 2018 IL 121932, ¶ 39. "A court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. Without an evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature." *Id*. A defendant must present an as-applied constitutional challenge to the trial court in order to create a sufficiently developed record; however, there is a very narrow exception to that rule for an as-applied claim pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012) for which the record is sufficiently developed for appellate review. *People v. Holman*, 2017 IL 120655, ¶ 32. In *Holman*, the supreme court found the record sufficient to decide the defendant's *Miller* claim, and it therefore addressed the merits of the defendant's claim in the interest of judicial economy. *Holman*, 2017 IL 120655, ¶ 32.

¶ 20        Here, defendant presented his as-applied constitutional challenge both before and after he was sentenced. In his amended motion to declare the sentencing statute unconstitutional, filed before sentencing, defendant asserted he was 21½ years old at the time of the offense with a long history of mental health diagnosis and issues; the status of his mental health treatment played a part in the events leading to his conviction; and "in light of developments in the areas of law, medicine, psychology, and science, to conclude that someone who is the age of the defendant is beyond redemption and is incapable of rehabilitation violates the Eighth Amendment of the U.S. Constitution as well as the Illinois Constitution." Defendant again raised this claim in his motion to reconsider the sentence.

¶ 21        Dr. Killian's forensic psychiatric evaluation report, dated August 24, 2019, specifically referenced the issue of mitigation as applied to defendant. Further, Dr. Killian's proffered testimony addressed the issue of appropriate punishment considering defendant's RAD diagnosis, his psychological and social history, his childhood abuse, his age, and his potential for rehabilitation. Thus, we find the record to be sufficiently complete regarding defendant's youth, abusive upbringing, mental health issues, and his potential for rehabilitation. Accordingly, we address the merits of defendant's claim in the interest of judicial economy. *Id.*

¶ 22                          B. As-Applied Constitutional Challenge

¶ 23        Whether a sentence is constitutional is a question of law, which is reviewed *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11. "Statutes are presumed constitutional, and the party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity." *People v. Coty*, 2020 IL 123972, ¶ 22. "A court must construe a statute so as to uphold its constitutionality if reasonably possible." *Id.* "A defendant who has an adequate opportunity to present evidence in support of an as-applied, constitutional claim will have his claim adjudged on the record he presents." *Id.*

¶ 24        "By definition, an as-applied constitutional challenge is dependent on the particular circumstances and facts of the individual defendant or petitioner. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *People v. Thompson*, 2015 IL 118151, ¶ 37. The eighth amendment prohibits, among other things, "cruel and unusual punishments" (U.S. Const., amend. VIII) and applies to the states through the fourteenth amendment. *People v. Buffer*, 2019 IL 122327, ¶ 15. A statute may be deemed unconstitutionally disproportionate in violation of the proportionate penalties clause of the Illinois constitution (Ill. Const. 1970, art. 1, § 11) if the punishment for the offense is

9

cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*).

¶ 25     The emerging adult theory proposes to apply *Miller* protections to young adults over the age of 18 because recent research in brain development suggests the brain and maturity continue to develop into a person's mid-twenties. However, "the Supreme Court has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *Harris*, 2018 IL 121932, ¶ 58. Claims for extending *Miller* protections to offenders 18 years of age or older have been repeatedly rejected. *Id.* ¶ 61. But juvenile defendants may still be sentenced to life imprisonment without parole if the trial court determines the defendant's conduct shows irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. *Holman*, 2017 IL 120655, ¶ 46. The trial court may make that decision only after considering the defendant's youth and attendant characteristics, which include:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.*

¶ 26     Defendant maintains the trial court sentenced him to life imprisonment without considering his age (21½ years), history of abuse, mental health issues, or capacity for rehabilitation. Defendant asks us to vacate his sentence in light of the recent advances in adolescent brain development

10

research and Illinois courts' recognition of the evolving standards of decency in sentencing young adults to life sentences, where there is no opportunity to demonstrate rehabilitation even after decades in prison.

¶ 27 The State argues we should reject any claim that defendant's sentence violates the eighth amendment under *Miller* because such a challenge is not cognizable for adult offenders over the age of 18. Even so, the State maintains the sentencing hearing was "*Miller* compliant" because the court did in fact consider defendant's youth and attendant circumstances. We agree with the State on both points.

¶ 28 We decline to extend *Miller* and its progeny to a 21-year-old defendant and reiterate that, for *Miller* purposes, the line between juveniles and adults is 18. However, Illinois courts have "not foreclosed emerging adult defendants between 18 and 19 years old from raising an as applied proportionate penalties clause challenge [under the Illinois constitution] to life sentences based on the evolving science on juvenile maturity and brain development." *People v. Clark*, 2023 IL 127273, ¶ 87. "Our supreme court has twice acknowledged that young adults—at least those who were 20 years of age or younger at the time of their crimes—may still rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois proportionate penalties clause. *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25; see *Thompson*, 2015 IL 118151, ¶¶ 43-44 (19-year-old defendant sentenced to a term of natural life in prison); *Harris*, 2018 IL 121932, ¶¶ 1, 48 (defendant, aged 18 years and 3 months, sentenced to 76 years in prison). "The evolving science on brain development may support such claims at some time in the future, but for now individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim." *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33. Even assuming a 21½ year old defendant can raise

11

an as-applied proportionate-penalties challenge to his or her sentence, we conclude defendant's claim lacks merit.

¶ 29 Here, Dr. Killian focused on defendant's individual characteristics, rather than the emerging adult theory, and suggested that theory ignores situations where there exist clear and well-documented reasons why there may be a further delay in brain development, as in defendant's case. Dr. Killian opined "a sentence of life without parole is not appropriate for Mr. Ramirez under the particular circumstances of the case." The Diagnostic and Statistical Manual of Mental Disorders (DSM) classifies RAD as a "trauma and stress-related condition of early childhood caused by social neglect and maltreatment." According to Dr. Killian, defendant fits the pattern of RAD "due to the physical and sexual abuse that he received from a string of adults in the home of his mother and continuing with the abuse that he continued to receive in the foster care system, all of which had a profound effect on him."

¶ 30 In addressing the issue of mitigation, Dr. Killian wrote, "Mr. Ramirez obviously suffered severe trauma in his childhood, being taken from his biological mother because of chronic abuse *** In addition, Mr. Ramirez described a lot of emotional abuse from his adoptive parents." He believed defendant could rehabilitate himself to the point of being a functional member of society and not pose a threat. But he further opined that defendant is currently too young to assess how he may be in 20, 30, or even 40 years. Although predictions of future human behaviors are difficult to make, the following factors weigh in defendant's favor: (1) he had virtually no history of criminal behavior; (2) there is very little indication of violence with other people; and (3) statistics show that aggressive, violent behavior decreases dramatically by the age of 40. Dr. Killian concluded, "it would be my opinion to a reasonable degree of medical certainty that it would be

12

wrong to incarcerate Mr. Ramirez for life without parole and find that there is no likelihood of rehabilitation based on the facts and circumstances of this case."

¶ 31    During the forensic psychiatric exam, defendant told Dr. Killian he killed his adoptive parents "because they were really horrible people, to put it bluntly." Dr. Killian asked why it was necessary to kill them, even if they were terrible, and defendant answered, "I tried suicide because I couldn't stand being with them and I realized that they're the ones who should be dead." He told Dr. Killian he could not live while his adoptive parents were still alive. Dr. Killian also asked defendant whether he would have still murdered his adoptive parents, knowing he would likely get caught, and defendant stated yes, he would have still murdered his parents, but only if his codefendant was not going to be charged. He felt guilty about his codefendant being caught. When asked if he had any thoughts about hurting anyone else, defendant said, "There have always been two sides of me; I love helping people and I will do random acts of kindness, and then sometimes, for no reason, I want to beat somebody. It's like the two sides of my brain are fighting with each other." Dr. Killian's proffered testimony states, "I am not suggesting that he needn't/shouldn't be punished. I believe he should go to prison for a long time."

¶ 32    Defendant's allegation that the trial court failed to consider his youth, traumatic and abusive upbringing, significant mental health issues, and potential of rehabilitation is flatly contradicted by the record. The trial court reviewed several documents, including Dr. Killian's report and proffered testimony, which contained discussion of defendant's individual characteristics, such as his age, traumatic and abusive upbringing, mental health issues, and potential for rehabilitation, and it specifically expressed its compassion for defendant's traumatic upbringing. But "our supreme court has repeatedly held that evidence of a defendant's mental or psychological impairments may not be inherently mitigating, or may not be mitigating enough to

13

overcome the evidence in aggravation." *People v. Robinson*, 2021 IL App (1st) 192289, ¶ 57. In this case, defendant enlisted a friend to help him murder his adoptive parents. The two discussed murdering his adoptive parents several times and discussed various methods over a period of months. They went to a hardware store to purchase items in preparation days before the murder. Defendant waited until his parents slept, entered their home, maced them, beat them over the head with a bat, stabbed them in the stomach and throat, inflicting multiple blunt-force and sharp-force injuries that killed them within minutes, and then wrapped their bodies and dumped them off a bridge. He attempted to clean the blood, but then staged the home to look like the scene of a burglary. He called 911 to report his parents missing days later. One police officer testified defendant showed more concern for a missing cat than for his missing parents. He confessed to the murders, but then misled police about the location of the bodies. Even considering defendant's individual characteristics, the mandatory sentence of life without parole was not so wholly disproportionate to the offense so as to shock the moral sense of the community. *Leon Miller*, 202 Ill. 2d at 238. Accordingly, we decline to find the sentencing statute unconstitutional as it applies to defendant.

¶ 33                    C. Defendant's Alternative Arguments

¶ 34        Because we have concluded the record is sufficient to review defendant's as-applied proportionate-penalties claim, we need not address defendant's alternative arguments, which rest on the premise that the record is not sufficient.

¶ 35                                III. CONCLUSION

¶ 36        The judgment of the circuit court of Peoria County is affirmed.

¶ 37        Affirmed.